UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

LONNIE LEE OWENS,                          )
                                            )
            Petitioner,                     )
                                            )
v.                                          )      No.:   4:14-CV-18-HSM-SKL
                                            )
HENRY STEWARD,                             )
                                            )
            Respondent.                     )

**MEMORANDUM & ORDER**

Acting pro se, Lonnie Lee Owens, ("Petitioner"), brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2005 judgment of conviction in Franklin County, Tennessee Circuit Court. [Doc. 1 at 1]. A jury convicted Petitioner of second-degree murder, theft of over $10,000.00, and abuse of corpse, and he is serving a sentence of 24 years. [*Id*. at 1-2]. Warden Henry Steward has filed an answer in opposition to the petition [Doc. 9], Petitioner has replied to the answer [Doc. 16], and this case is now ripe for disposition.

I.      **PROCEDURAL HISTORY**

On December 3, 2004, Petitioner was convicted by a jury in the Circuit Court of Franklin County, Tennessee on charges of second-degree murder, abuse of a corpse, and theft over $10,000.00. [Doc. 10-1 at 100-02]. On February 1, 2005, pursuant to the Tennessee Criminal Sentencing Reform Act of 1989, the trial court sentenced Petitioner to twenty-five years for the murder conviction, one year for abuse of corpse, and four years for the theft; these sentences were ordered to be served consecutively, for a total term of thirty years' imprisonment. [Docs. 10-2, 10-3].

Through counsel, Petitioner filed a direct appeal, challenging only his sentences. [*See* Doc. 4]. On October 18, 2005, the Tennessee Court of Criminal Appeals ("TCCA") granted Petitioner's appeal in part, reducing his sentence for the second-degree murder conviction to twenty-four years and reversing the trial court's order that the sentences be run consecutively, rather than concurrently. [Doc. 10-7]. On March 27, 2006, the Tennessee Supreme Court denied Petitioner's request for permission to appeal the decision of the TCCA. [Docs. 10-8, 10-9].

On November 3, 2006, Petitioner initiated his pro se petition for post-conviction relief, pursuant to Tenn. Code Ann. § 40-30-101, *et seq.*, in the Circuit Court for Franklin County, Tennessee, and subsequently filed three amended petitions. [Doc. 10-10 at 14-51, 101-02, 130-51; Doc. 10-11 at 106-11]. An evidentiary hearing was held on August 1, 2011, and the court denied the petition on October 6, 2011. [Doc. 10-11 at 139-68; *see* Docs. 10-12 through 10-14]. On April 4, 2013, the TCCA affirmed the denial of the petition, and, on October 16, 2013, the Tennessee Supreme Court denied Petitioner's request for permission to appeal. [Docs. 10-11 at 170; Docs. 10-28 through 10-30].

On March 4, 2014, Petitioner filed his instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. [Doc. 1]. The parties agree that the petition was timely filed and that Petitioner has properly exhausted all of the claims raised therein. [Doc. 9 at 2-3; Doc. 16 at 3].

## II.     DISCUSSION

Pursuant to Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), state prisoners may seek federal habeas corpus relief on the ground that they are being held in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254; *Reed v. Farley*, 512 U.S. 339, 347 (1994). However, Congress has mandated that federal courts review state court adjudications on the merits of such claims using a "highly deferential" standard of

2

review.  *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  Under this deferential standard, this Court may not grant habeas relief to a state prisoner unless the state court's decision on the merits of his claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law," for the purposes of § 2254(d)(1), refers to rulings of the United States Supreme Court in place at the time of "the last state-court adjudication on the merits." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (defining clearly established federal law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision").  A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state-court decision unreasonably applies clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The standards set forth in the AEDPA are "intentionally difficult to meet."  *Woods*, 135 S. Ct. at 1376 (quoting *White*, 134 S. Ct. at 1702); *see also Harrington*, 131 S. Ct. at 786 ("If [§ 2254(d)] is difficult to meet, that is because it was meant to be.").  Ultimately, however, the AEDPA's highly deferential standard requires this Court to give the rulings of the state courts "the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v.*

3

*Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

In his instant petition, Petitioner has raised six grounds for relief pursuant to § 2254 which were adjudicated on the merits in state court. In Ground 1, he argues that the trial court improperly enhanced his sentence based on facts not determined by a jury, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), and that the resultant sentence thus violates the Sixth Amendment to the U.S. Constitution. In Grounds 2 through 6, he asserts the following claims of ineffective assistance of counsel: (Ground 2) that counsel was ineffective in failing to challenge the sufficiency of the evidence supporting his convictions on direct appeal;[1] (Grounds 3 & 6) that counsel rendered ineffective assistance "when he pled the Petitioner guilty to the offense of [voluntary m]anslaughter, in the presence of the jury and without the consent of the Petitioner," precluding a jury charge for any lesser-included offense to voluntary manslaughter; (Ground 4) that counsel was ineffective in failing to object to "erroneous and prejudicial" statements in the pre-sentence report and in failing to include the trial transcript on appeal; and (Ground 5) that counsel was ineffective in failing to adequately cross-examine, impeach, or elicit favorable testimony from the medical examiner, Dr. Charles Harlan. [Doc. 1 at 6-13; Doc. 2 at 5-31].

The Court will first address Petitioner's claim that his sentence is unconstitutional, and then

---

[1]      Although Petitioner states that he "had other non-frivilous [sic] claims he would have raised on appeal if given the opportunity," sufficiency of the evidence is the only such claim that he specifically identifies in his instant petition. [Doc. 16 at 18-23]. He cites *Rodriguez v. United States*, 395 U.S. 327, 330 (1969), as support for the proposition that "[i]t is not necessary or required that the Petitioner detail exactly what issues he would have raised on appeal." [*Id.*]. Petitioner's contention, however, is erroneous. Unlike the petitioner in *Rodriguez*, Petitioner was not deprived of an appeal entirely, nor was he actually or constructively denied the assistance of counsel altogether on appeal. *See, e.g.*, *Roe v. Flores-Ortega*, 528 U.S. 470, 482-83 (2000); *Smith v. Robbins*, 528 U.S. 259, 286 (2000). Thus, prejudice cannot be presumed, as it may be in the above-described circumstances, and Petitioner instead bears the burden of demonstrating that counsel's errors had an adverse effect on his defense. *See Roe*, 528 U.S. at 483-83. The Court cannot find that Petitioner suffered any prejudice as a result of counsel's failure to raise any issue on appeal that Petitioner has not identified.

4

will consider his ineffective assistance of counsel claims in chronological order.[2]

A.      Sentencing Claim

In his first claim, Petitioner contends that the trial court improperly enhanced his sentence by applying an enhancement factor for "extreme cruelty to the victim," pursuant to Tenn. Code Ann. § 40-35-114, based on judicial fact-finding.  [Doc. 1 at 6-8; Doc. 2 at 5-9].  Petitioner then maintains that his sentence violated *Blakely v. Washington*, 542 U.S. 296 (2004), and that the Supreme Court confirmed that a sentence enhanced based on judicial fact-finding is unlawful in the subsequent case of *Cunningham v. California*, 549 U.S. 270 (2007).  [Doc. 2 at 5-9].  Thus, he opposes his sentence as unconstitutional under clearly established federal law.  [*Id.*].

In response, Respondent argues only that *Blakely* errors are subject to harmless error analysis and that the harmless error standard is satisfied in this case.  [Doc. 9 at 16-18].  Specifically, Respondent argues that "there is no question that the jury would have found that the petitioner treated the victim with exceptional cruelty during the commission of the offense" based on the facts presented at trial: that he struck the victim, bound her hands and feet, covered her mouth and nose with duct tape, all while the victim's children were in the house; that she "tried desperately to continue breathing but eventually suffocated to death"; and that he took her body to an island and buried it in a shallow grave.  [*Id.* at 18].

In Reply, Petitioner asserts that there is no question that the application of the enhancement factor in question violated *Blakely*, as the sentencing scheme under which he was enhanced "was

---

[2]          Due to the voluminous nature of the record in this case, and the specific but varied nature of Petitioner's claims, the Court will not endeavor to provide a full factual background of the underlying proceedings.  The Court will instead include the relevant facts in the discussion of each of Petitioner's claims.  The Court notes for the record that Respondent has provided a statement of the evidence, setting forth the facts as found by the TCCA in Petitioner's direct appeal and appeal of the denial of his post-conviction petition.  [Doc. 9 at 3-15].  In his reply brief, Petitioner agrees that the statement of evidence contained in Respondent's brief "is accurate and properly reflects … the case facts as summarized by the TCCA."  [Doc. 16 at 3].

5

subsequently rendered unconstitutional" by *Cunningham*. [Doc. 16 at 9, 16]. He notes that Respondent did not argue that no *Blakely* error occurred and maintains that he has therefore conceded that such a violation occurred. [*Id*. at 4, 6, 16]. He maintains that the harmless error analysis used by the Respondent does not apply in this case and that the Court must instead conduct an evidentiary hearing to assess whether the *Blakely* violation had a substantial and injurious effect. [*Id*. at 4-18].

       1.   *Blakely* Violation

The United States Supreme Court precedent relevant to the consideration of a claimed *Blakely* error begins in 2000 with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"; otherwise, the sentence in question may run afoul of the Sixth Amendment right to trial by jury. *Id*. at 490-500.

Then, in 2004, the Supreme Court issued its decision in *Blakely v. Washington*, 542 U.S. 296 (2004), which "clarified that the definition of 'statutory maximum' for *Apprendi* purposes is not the high-end that a sentence may not exceed, but rather the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Lovins v. Parker*, 712 F.3d 283, 289 (6th Cir. 2013) (quoting *Blakely*, 542 U.S. at 303). In other words,

> [T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, … and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (internal citation and quotation marks omitted).

On January 12, 2005, the Supreme Court decided *United States v. Booker*, 543 U.S. 220, 243-44 (2005), which applied *Apprendi* and *Blakely* to the United States Sentencing Guidelines, declaring

as unconstitutional the provision that made the Guidelines mandatory, and reaffirmed that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

It was against this legal landscape that Petitioner was sentenced, on February 1, 2005, for his state convictions for second-degree murder, abuse of corpse, and theft. Petitioner was classified as a Range I offender under Tennessee law, which subjected him to a minimum sentence of fifteen years and a maximum sentence of twenty-five years for the offense of second-degree murder; however, the presumptive sentence without the application of any enhancing or mitigating factors was twenty years. [Doc. 10-24 at 80; *see also* Doc. 10-7 at 6]. The court found one mitigating factor – that Petitioner did not have a prior criminal history. [Doc. 10-24 at 80]. However, the court also found two enhancement factors: that Petitioner treated the victim with "exceptional cruelty" during the commission of the offense, and that the personal injuries inflicted upon the victim were particularly great, noting

> I think we have an individual that based on the proof that was presented in the trial – at the trial was duct taped while alive, and was allowed to suffocate and die, and I think that, in fact, fits the statutory definition of both inflicting personal – personal injuries and exceptional cruelty[.]"

[*Id.* at 80-81]. The court concluded that there was "no comparison" of the enhancement and mitigating factors and sentenced Petitioner to a term of twenty-five years' imprisonment. [*Id.* at 81].

On April 15, 2005, shortly after Petitioner's sentencing, the Tennessee Supreme Court considered the applicability of *Blakely* to Tennessee's Criminal Sentencing Reform Act of 1989, Tenn. Code Ann. § 40-35-210, *et seq.* (2003). *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) ("*Gomez I*"). The Tennessee Supreme Court noted that *Blakely* "[a]dmittedly … includes language

which c[ould] be broadly construed to require" a finding that defendants' sentences were unconstitutional based on application of enhancement factors and imposition of maximum sentences predicated solely on judicial fact-finding. *Id*. at 649, 658. However, in light of *Booker*, it ultimately rejected a broad reading of *Blakely*, concluding that the relevant inquiry remained whether the Reform Act *mandated* the imposition of a sentence in excess of the presumptive sentence when a judge found an enhancement factor. *Id*. at 661 ("*Booker* explains that the mandatory increase of a sentence is the crucial issue which courts must consider in determining whether a particular sentencing scheme violates the Sixth Amendment."). Noting that the finding of an enhancement factor under the Reform Act did not mandate an increased sentence, the Tennessee Supreme Court ultimately concluded that Tennessee's sentencing scheme was not unconstitutional. *Id*.

Petitioner's direct appeal was decided by the TCCA on October 18, 2005. The court reversed the sentencing court's decision to run the sentences consecutively and to apply the personal injuries enhancement factor; accordingly, it lowered Petitioner's sentence to a term of twenty-four years.[3] [Doc. 10-7 at 6, 8-9]. However, the Court found no error with respect to the exceptional cruelty enhancement:

> Although we do not have any medical testimony about the victim's death in the record before us,[4] the trial court did make a finding for the record during the sentencing hearing that "this was a death by strangulation where the lady was duct taped." The Defendant admitted that he assaulted the victim in his house while their children were close by. The presentence report admitted into evidence at the sentencing hearing without objection sets forth in part that the Defendant
>
> > used duct tape to tape the victim's legs together and her hands behind her back. He then taped her face from the chin to just under her eyes covering her mouth and nose.... Dr. Charles Harlan noted in the autopsy report that ...

---

[3]     *State v. Owens*, 2005 WL 2653973 (Tenn. Ct. App. Oct. 18, 2005).

[4]     It is undisputed that trial counsel did not submit a copy of the transcript from Petitioner's trial on direct appeal.

[h]e ... found traces of duct tape in the victim's lung. Dr. Harlan concluded that the victim's death was caused by suffocation as a result of having her mouth and nose covered with duct tape.

The Defendant does not contest these facts but contends that the method by which he killed the victim did not involve abuse or torture and that this enhancement factor is therefore inapplicable.

The use of exceptional cruelty in the killing of the victim is not an element of second-degree murder and may therefore, where appropriate, be considered as an enhancement factor. *See State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). The proper application of this factor in a murder case requires evidence that denotes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely the pain or suffering inflicted as the means of accomplishing the murder. *See* [*State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001)]. Our supreme court has recognized that this enhancement factor may be applicable where there is proof of extensive psychological abuse or torture. *See id*. at 259. For example, the application of this enhancement factor to an especially aggravated robbery conviction has been upheld where the defendant executed two persons by gunshots after having forced them onto the floor of a walk-in cooler. *See State v. Reid*, 91 S.W.3d 247, app. 311 (Tenn. 2002) (finding that the defendant committed the especially aggravated robbery with exceptional cruelty because "[t]he anguish experienced by the victims at this point [in the cooler] while they awaited their execution is unfathomable"). In upholding the application of this enhancement factor in the *Reid* case, this Court also noted the defendant's "calculated indifference toward suffering." *Id*.

We think the facts support the application of this enhancement factor to the means by which the Defendant killed his estranged wife. The record before us indicates that the Defendant bound the victim's hands and feet and then covered her mouth and nose with duct tape. The Defendant committed these actions while the victim was in his house and while her children were mere feet away. [The Defendant testified during the sentencing hearing that the children were 30 to 40 feet away when he killed the victim]. The autopsy of the victim revealed traces of duct tape in one of the victim's lungs: indicating how desperately she tried to continue breathing. After the victim was dead, the Defendant took her body to an island in Tims Ford Lake and buried it in a shallow grave. He then returned to his house and had sex with his girlfriend. These facts indicate that this Defendant treated the victim with a calculated indifference to her suffering and that he achieved some form of gratification from murdering his wife. These facts also establish that the victim tried desperately to continue breathing but eventually suffocated to death. We have no trouble concluding that the victim's suffering while she struggled to live was "unfathomable" and was the direct result of the method used by the Defendant to accomplish the killing.

As noted by Judge Scott, "If strangulation, with the victim vigorously fighting for

9

another breath, is not exceptional cruelty, I don't know what is." *State v. Bobby Lee Knight*, No. 87-234-III, 1989 WL 24436, at *4 (Tenn. Crim. App., at Nashville, Mar. 21, 1989) (Scott, J., dissenting). The Defendant's assertion that the trial court erred in applying this enhancement factor to his conviction for second-degree murder is without merit.

The Defendant also argues that the trial court erred in applying enhancement factors to his sentence on the basis of the United States Supreme Court's decision in [*Blakely*]. The *Blakely* decision holds that the Sixth Amendment to the federal Constitution permits a defendant's sentence to be increased only if the enhancement factors relied upon by the judge are based on facts reflected in the jury verdict or admitted by the defendant. *See id.*, 124 S. Ct. at 2537. The only basis upon which enhancement is otherwise permitted is the defendant's previous criminal history: where the defendant has prior convictions, the trial court may enhance the defendant's sentence without an admission or jury finding. *See* [*Apprendi*]; *Blakely* at 2536. Subsequent to the Defendant's appeal of this case, the Tennessee Supreme Court considered the impact of *Blakely* on Tennessee's sentencing scheme and concluded that the Criminal Sentencing Reform Act of 1989, pursuant to which the Defendant was sentenced, does not violate a defendant's Sixth Amendment rights. *See State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005). Accordingly, the Defendant's argument on this basis has no merit.

[Doc. 10-7 at 5-10]. On March 27, 2006, the Tennessee Supreme Court denied Petitioner's application for review of his direct appeal. [Doc. 10-9; *see* Doc. 10-8].

Then, on January 22, 2007, the Supreme Court issued its opinion in *Cunningham v. California*, 549 U.S. 270 (2007), invalidating California's determinate sentencing law – a law virtually identical to Tennessee's Reform Act – in light of *Blakely*. In analyzing the law under *Apprendi*, *Blakely*, and *Booker*, the California Supreme Court concluded that, in "operation and effect," California's sentencing system "simply authorize[s] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." *Id.* at 289 (discussing *People v. Black*, 113 P.3d 534 (Cal. 2005)). Similarly to the Tennessee Supreme Court in *Gomez I*, the California Supreme Court held that, because the sentencing judge retained "ample discretion" with respect to sentencing, California's determinate sentencing law did not "diminish the traditional power of the jury," and as

10

such, did not implicate any Sixth Amendment concerns. *Id*. at 289-90 (quoting *Black*, 113 P.3d at 544).

The Supreme Court, however, disagreed, stating, "[o]ur decisions … leave no room for such an examination." *Id*. at 291. The Court noted

> We cautioned in *Blakely* that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Id*. at 290-91. It further rejected any comparison of California's sentencing law to the advisory federal system in *Booker*, noting that any discretion afforded to California's judge to deviate from the presumptive mid-range sentence was born from judicial fact-finding of aggravating factors, rather than from any discretion inherent in the sentencing statute itself. *Id*. at 292-93. The Court concluded that its "decisions from *Apprendi* to *Booker* point to the middle term specified by California's statutes, not the upper term, as the relevant statutory maximum," and that, because the sentencing law in question "authorize[d] the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." *Id*. at 293.

On February 20, 2007, the Supreme Court vacated *Gomez I*, and remanded to the Tennessee Supreme Court for consideration in light of *Cunningham*. *Gomez v. Tennessee*, 549 U.S. 1190 (2007). On remand, the Tennessee Supreme Court held that the Reform Act "violated the Sixth Amendment as interpreted by the Supreme Court in *Apprendi*, *Blakely*, and *Cunningham*." *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007) ("*Gomez II*").

There is thus no question that, if Petitioner were sentenced today, the enhanced sentence that he received for his second-degree murder conviction would violate *Blakely*. On review of a § 2254

11

petition, the Court is not, however, tasked with determining whether a movant's conviction or sentence is unconstitutional based on the current state of the law; rather, it must determine whether state court's decision of the claim resulted in a decision that was contrary to or involved an objectively unreasonable application of clearly established federal law at the time the state court rendered its decision.

Even under this exacting standard, and giving the state court the benefit of the doubt – as this Court is required to do under § 2254(d)'s deferential standard – the Court finds that the state court's conclusion that Petitioner's sentence did not violate *Blakely* was contrary to clearly established federal law. In denying Petitioner's *Blakely* claim, the state court relied upon *Gomez I*'s holding that the Reform Act was not unconstitutional under *Blakely*; *Gomez I* concluded that, in light of *Booker*, the Reform Act could not offend the Sixth Amendment because it did not *require* the sentencing judge to increase a sentence upon finding an enhancement factor. This analysis, however, essentially ignored the primary holding of *Blakely*:

> [T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, … and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (internal citation and quotation marks omitted). Indeed, it also ignored the fact that, in *Booker*, the Supreme Court expressly "reaffirm[ed] [its] holding in *Apprendi*: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 543 U.S. at 244.

Thus, at the time that the state court reviewed Petitioner's *Blakely* claim, it was a matter of clearly established federal law that the Sixth Amendment right to trial by jury is violated when a

12

judge imposes a sentence in excess of the relevant statutory maximum based on additional findings of fact that were not admitted by the defendant or proved to the jury beyond a reasonable doubt. Nonetheless, Tennessee's courts concluded that the Reform Act did not conflict with the Sixth Amendment, despite the fact that sentencing judges were permitted to enhance the presumptive mid-range – the relevant statutory maximum, as defined by *Apprendi* and *Blakely* – based on independent judicial findings of fact.

Such a result was contrary to the governing legal principles set forth in *Apprendi*, *Blakely*, and *Booker*. Indeed, the Supreme Court said as much in *Cunningham*, expressly stating that its *Apprendi* jurisprudence "leave[s] no room" for the interpretation adopted by the Tennessee Supreme Court in *Gomez I*. Had the state court applied the correct governing principles of *Apprendi*, *Blakely*, and *Booker*, it would have had no choice but to conclude that a *Blakely* error occurred when Petitioner's sentence was enhanced beyond the twenty-year presumptive sentence based on the sentencing judge's findings that Petitioner treated his victim with exceptional cruelty.

2.      Harmless Error

Notably, Respondent does not contest these conclusions. He does not argue that the state court's interpretation of *Apprendi*, *Blakely*, and *Booker* was not contrary to clearly established federal law, and he does not argue that no *Blakely* violation occurred. Apparently conceding the state court's constitutional error, Respondent argues only that the sentencing judge's application of the exceptional cruelty enhancement in this case was "harmless error":

> In this case, it is clear that the jury would have found that the petitioner treated the victim with exceptional cruelty during the commission of the offense. The petitioner struck the victim, then bound her hands and feet and covered her mouth and nose with duct tape. The petitioner committed these actions while the victim was in his house and while her children were mere feet away. After the victim was dead, the petitioner took her body to an island in Tim's Ford Lake and buried it in a shallow grave. The facts established that the petitioner treated the victim with a calculated

13

indifference to her suffering. The facts also established that the victim tried desperately to continue breathing but eventually suffocated to death. The Tennessee Court of Criminal Appeals []had no trouble concluding that the victim's suffering while she struggled to live was unfathomable and was the direct result of the method used by the Defendant to accomplish the killing. *Owens,* 2005 WL 2653973 at \*6. There is no question that the jury would have found that the petitioner treated the victim with exceptional cruelty during the commission of the offense.

[Doc. 9 at 18].

Respondent is correct that *Blakely* errors are subject to a constitutional harmless error analysis. *See, e.g., Lovins,* 712 F.3d at 303 ("In determining the proper remedy for a *Blakely* error, we ordinarily consider whether the error was harmless."); *Villagarcia v. Warden, Noble Corr. Inst.,* 599 F.3d 529, 536 (6th Cir. 2010) ("Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error, and accordingly, such error is subject to harmless error analysis.") (internal quotation marks omitted); *Washington v. Recuenco,* 548 U.S. 212 (2006); *c.f. Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir. 1999) (noting that the constitutional harmless error standard applies even "when the federal district court is the first court to review for harmless error."). In cases involving collateral review of state court decisions, an error is harmless "unless it had substantial and injurious effect or influence" on the outcome in question. *Villagarcia,* 599 F.3d at 536. Stated another way, an error is not considered harmless "when the matter is so evenly balanced that the habeas court has grave doubt as to the harmlessness of the error." *Lovins,* 712 F.3d at 303 (quoting *Villagarcia,* 599 F.3d at 537); *see also United States v. Hazelwood,* 398 F.3d 792, 801 (6th Cir. 2005) ("Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless").

At the time of Petitioner's sentencing, Tennessee law required "a finding of acts 'separate and apart from the actions which constituted the offenses'" in order to sustain an enhancement for exceptional cruelty to the victim. *See State v. Scott,* 2011 WL 2420384, at \*32 (Tenn. Ct. App. June

14

14, 2011) (quoting *State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997)).  "The facts of the case must denote the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged."  *Id.* at *32 (*citing State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001)) (internal quotation marks and alteration omitted).

The following facts from Petitioner's trial are relevant to the Court's harmless error analysis. At trial, Defendant testified in his own defense.  [Doc. 10-22 at 14-164].  He testified that, on the day of the victim's death, he had spoken with the victim – his estranged wife – and had asked when she would be coming by his house to pick up their children, but she did not tell him what time she planned to arrive.  [*Id.* at 111-12, 116-17].  That afternoon, he was at home doing laundry while his children napped.  As he walked to the kitchen, he heard someone yell "F-you."  [*Id.* at 59-63, 120]. He then "swung as hard as [he] could," because he "just knew somebody was behind [him] and they were right on top of [him]."  [*Id.* at 62-63, 121].  That swing hit the victim in the head, causing her to hit the floor hard.  [*Id.* at 59-63, 124].  The victim made no movement, and Defendant believed that she was dead; after pacing for a few minutes, he checked her arm and confirmed that she had no pulse.  [*Id.* at 63-65, 125-26, 130].

Defendant was expecting people to arrive at the house "any minute," so he tried to move the victim's body, but he could not secure it in his arms due to its flailing limbs.  [*Id.* at 65-67, 130-31]. He bound her feet and arms with duct tape, and, noticing that her face was turning "gray colored," he covered her head with duct tape as well.  [*Id.* at 65-67].  When asked why he proceeded to cover the victim's face with duct tape, Petitioner responded, "I don't know," and then stated that he "didn't want to look at her."  [*Id.* at 67, 69].  Petitioner was "scared" and put the body in the shed behind his house.  [*Id.* at 68-69].  He threw away her shoes, purse, and cellphone, and took the victim's truck to

15

the parking lot of a local store; later that day, he called the victim's cellphone and left a voice message, asking about her plan to pick up the children, and then he went with his girlfriend and children to a party. [*Id* at 69-74, 133-138]. When they returned home after 11:00 p.m. that evening, Petitioner asked his girlfriend to watch the children because he "wanted to go fishing[.]" [*Id*. at 74-75, 142]. Because he felt that he "had to do something. Get [the victim] away from the house," he took the victim's body to an island in his boat and buried her. [*Id*. at 75-78, 142-44].

The medical examiner, Dr. Charles Harlan, testified regarding his autopsy of the victim's body. [Doc. 10-21 at 46-60]. He testified that the victim's wrists were duct taped behind her body and that duct tape also bound her ankles. [*Id*. at 52]. Duct tape was "wrapped in a circular fashion [all the way] around the head covering the area of the nose and mouth and upper portion of the chin[.]" [*Id*. at 53]. Based on his autopsy, Harlan concluded, with a reasonable degree of medical certainty, that the victim died as a result of asphyxia due to duct tape occluding her airway. [*Id*. at 55-56]. There was no testimony regarding tape particles in the victim's lungs; rather, Harlan testified that he reached his conclusion regarding death by asphyxiation due to the lack of evidence supporting any other cause of death. [*Id*. at 55-58]. Harlan stated that there was no evidence of blunt force trauma, such as hemorrhaging, fractures, bruising of the brain, or tearing of the skin. [*Id*. at 56-58].

On cross-examination, Harlan confirmed that asphyxia by duct tape was an "extremely unusual form of death." [*Id*. at 60]. He was also questioned regarding whether the victim may have been conscious or unconscious when the duct tape was applied to her face:

| Counsel: | Now, somebody that was tied up, death wouldn't be immediate, they'd struggle? |
|---|---|
| Harlan: | It depends on whether they're conscious or not. |
| Counsel: | You anticipate my point. You really don't have any opinion as to whether this person was rendered unconscious first, isn't that right? |

16

| Harlan: | I don't have an opinion about conscious or unconscious. |
|---|---|
| Counsel: | Right. |
| Harlan: | You can't tell the state of consciousness from a dead body. |
| Counsel: | The person could have been rendered unconscious before this happened? |
| Harlan: | Correct.  You could receive a blow that would render you unconscious that would be enough to cause loss of consciousness, but not leave a mark and not be enough to be the direct cause of death. |
| Counsel: | Correct.  And a person that was rendered unconscious might have the appearance of being dead? |
| Harlan: | They might. |
| Counsel: | And unless you were a trained medical professional that knew how to check for signs of life, you might think somebody was dead? |
| Harlan: | You might. |

[*Id*. at 61-61].  Harlan was also questioned about petechial hemorrhaging – that is, ruptured capillaries – in the eyes, face, lungs, and neck, and responded that "[i]t can be seen in suffocation or asphyxia," and is "supportive" of a cause of death by asphyxiation but is not "required" or "necessary" for such a conclusion.  He confirmed that he did not find such hemorrhaging in his autopsy of this victim.  [*Id*. at 71-73].

The trial judge instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter.  [Doc. 10-23 at 102-04].  First-degree murder required the jury to find that the defendant killed the victim, intentionally, and with premeditation; second-degree murder required the victim to "knowing[ly]" kill the victim; and voluntary manslaughter required the jury to find that the defendant intentionally or knowingly killed the victim as the result of "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."  [*Id*. at 102-04, 107-08].  The jury unanimously found Petitioner guilty of second-degree

murder. [*Id*. at 125].

Thus, the Respondent is correct that the evidence at trial showed that Petitioner struck the victim, then bound her hands and feet and covered her mouth and nose with duct tape, and committed these actions while the children of Petitioner and the victim were asleep in the same house. He is also correct that, after the victim was dead, Petitioner took her body to an island and buried it in a shallow grave.

However, the facts at trial did not, as Respondent contends, clearly demonstrate that "the victim tried desperately to continue breathing," or that she "suffer[ed] while she struggled to live" and breathe. Petitioner himself testified that the victim was immobile and appeared to be dead by the time that he placed duct tape on her face. And, although he testified that suffocation was the cause of death, Harlan specifically testified that he had no medical opinion as to whether or not the victim struggled to breathe, or indeed, whether she was even conscious at the time that the Petitioner duct taped her mouth and nose. He confirmed that it was possible that the victim could suffocate from being duct taped after being knocked unconscious by a blow that left no mark, that she could have appeared dead to Petitioner, and subsequently suffocated as a result of the duct tape.

Given this limited and open-ended testimony regarding the timing and nature of the victim's cause of death, it is not, as Respondent now maintains, "clear" that the jury would unquestionably have found that Petitioner treated the victim with "exceptional cruelty." The jury convicted the Petitioner only of second-degree murder, which required them to find that he knowingly killed the victim; it specifically rejected a conviction for first-degree murder, thereby also rejecting any theory of premeditation. The evidence presented at trial, including Petitioner's own testimony and that of Dr. Harlan, allowed the jury to reach the conclusion that Petitioner knowingly killed the victim without accepting the State's theory that Petitioner stood idle – or worse – while the victim suffered,

18

struggling and gasping for breath, until succumbing to asphyxiation. Stated another way, the facts presented at trial are at least ambiguous as to whether Petitioner "inflict[ed] pain or suffering for its own sake or from the gratification derived therefrom," rather than merely "as the means of accomplishing the crime charged."

Based on this ambiguity, the Court has grave doubt that the jury would have found beyond a reasonable doubt that Petitioner acted with "exceptional cruelty" in committing this murder; such doubt results in the inevitable conclusion that the *Blakely* violation in this case was not harmless error.[5] *See State v. Higgins*, 2007 WL 2792938, at \*13 (Tenn. Ct. App. Sept. 27, 2007) (finding that trial court's enhancement for exceptional cruelty to the victims violated the defendant's Sixth Amendment right because "the record shows that any evidence that would be necessary to justify application of th[is] enhancement factor[] was not found by the jury beyond a reasonable doubt"); *see also Lovins*, 712 F.3d at 303-04 (finding no harmless error for *Blakely* violation where jury's verdict could not possibly be considered to encompass facts supporting enhancements for "history of unwillingness to comply with conditions of release" and "showed no hesitation about committing a crime with a high risk of human life").

The Court is thus "constrained to conclude that the judicial factfinding in [Petitioner's] sentencing was unconstitutional and that the remedy [he] requests is due." *See Lovins*, 712 F.3d at 304. The petition for a writ of habeas corpus will be conditionally **GRANTED** with respect to Petitioner's *Blakely* claim; Petitioner's sentence will be **VACATED,** and Petitioner is to be released

---

[5]     The Court notes the irony inherent in Respondent's argument that the jury "would have" made factual findings supporting the exceptional cruelty enhancement. *Apprendi* and its progeny demonstrate that such speculation should not be necessary if the dictates of the Sixth Amendment have been faithfully followed, as any facts that increase the penalty for a crime beyond the statutory maximum must be submitted to the jury and proved by the prosecution beyond a reasonable doubt. If the parties and the courts are left to speculate and argue about what the jury "would have" found, it is a clear sign that *Apprendi* is implicated and that the sentence in question may infringe upon the defendant's Sixth Amendment rights.

from incarceration, unless the State of Tennessee re-sentences him within ninety days.

B. Ineffective Assistance of Counsel Claims

Petitioner has also raised numerous grounds alleging ineffective assistance of counsel.[6] Ineffective assistance of counsel is a recognized constitutional violation that, when adequately shown, warrants relief under § 2254. The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, (1984), governs claims of ineffective assistance of counsel raised pursuant to 28 U.S.C. § 2254. *See Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the proceedings unfair and the result unreliable. *Strickland,* 466 U.S. at 687.

In assessing counsel's performance, a court must presume that counsel's questioned actions might have been sound strategic decisions and must evaluate the alleged errors or omissions from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Id.* at 689; *see also Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]") (quoting *Strickland*, 466 U.S. at 690). Only when the challenged actions are "outside the range of professionally competent assistance" will counsel's performance be considered constitutionally deficient. *Strickland*, 466 U.S. at 690.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*,

---

[6]     In his Answer, Respondent did not make specific arguments as to Petitioner's various grounds of ineffective assistance. Instead, Respondent quoted the TCCA's analysis of Petitioner's ineffective assistance of counsel claims – which were all denied – and concluded that all of Petitioner's claims should be denied because the state court's determination was "not contrary to or an unreasonable application of, clearly established federal law …. The [TCCA] correctly identified and applied the governing *Strickland* standard in this case, and its determination was supported by the record." [Doc. 9 at 18-24].

466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

When a petitioner raises an ineffective assistance of counsel claim in his § 2254 petition, the Court must review the state court's ruling on that claim under the highly deferential standard of the AEDPA. Thus, in order to succeed on a federal claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that the state court's ruling on his ineffective assistance of counsel claim was an unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). "Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

The Court will address Petitioner's ineffective assistance of counsel claims in chronological order, considering first his claims against trial counsel, then his sentencing claim, and finally, his claim asserting ineffectiveness in his appellate proceedings.

### 1. Admitting Guilt to Manslaughter at Trial

It is undisputed that, at Petitioner's trial, counsel attempted to enter a plea to voluntary manslaughter on Petitioner's behalf immediately after the indictment was read. The trial court rejected the plea, instead submitting the case to the jury. During counsel's opening statement, counsel advised the jury that Petitioner accepted responsibility for voluntary manslaughter but maintained that he was not guilty of first-degree or second-degree murder.

In Grounds 3 and 6, Petitioner argues that trial counsel rendered ineffective assistance "when he pled the Petitioner guilty to the offense of Manslaughter, in the presence of the jury" and without the consent of the Petitioner," thereby precluding a jury charge for any lesser-included offense to voluntary manslaughter. [Doc. 1 at 9-11, 13; Doc. 2 at 16-22, 27-29; Doc. 16 at 23-30]. He argues that the state court's determination that Petitioner consented to this strategy was erroneous, as it was based solely upon trial counsel's testimony that this strategy was discussed with Petitioner and that he consented. [Doc. 2 at 16-22, 27-29]. Petitioner, however, maintains that: (1) he was not told about the strategy; (2) he did not consent to the strategy; and (3) he believed that counsel intended to pursue only a theory of self-defense. [*Id.*]. Petitioner contends that written consent and/or an "on-the-record" inquiry was required in order for counsel to agree to a guilty plea in front of the jury and that no such consent is found in this case. [*Id.*].

Petitioner argues that he was prejudiced by this action because it destroyed his self-defense theory, as well as his "credibility [in testifying] that the homicide was not knowing and intentional." [*Id.*]. He also argues that he was prejudiced by this action, as it deprived the trial judge of an opportunity to charge the jury on any lesser-included offense below manslaughter and that counsel was further deficient in failing to request a jury instruction for lesser-included offenses below manslaughter and/or in failing to object to the trial court's statement that it would not consider instructions on charges less than manslaughter. [*Id.* at 27; Doc. 16 at 38-39].

Petitioner raised this ground of ineffective assistance of counsel in his post-conviction proceedings in state court. [*See* Doc. 10-10 at 20, 32-36, 133-41]. The trial court conducted a hearing on the petition, where Petitioner testified, as did his trial attorneys.[7] [Doc. 10-13].

---

[7]     As previously noted, Petitioner concedes that Respondent's statement of the evidence, as taken from the factual summary in the opinion of the TCCA on Petitioner's post-conviction petition, is "accurate" and properly

Petitioner testified that strategy was generally not discussed at his meetings with trial counsel, which lasted only ten to fifteen minutes, and occurred only every two to three months. He testified that he was not aware that counsel was planning to ask the jury to convict him of voluntary manslaughter, that he objected to such a strategy, and that he believed that counsel would pursue a theory of self-defense at trial. He confirmed that counsel told him that he would be "convicted of something," but he believed that statement referred to a self-defense theory.

By contrast, trial counsel testified that there were many meetings with Petitioner regarding trial strategy, including the strategy of admitting Petitioner's guilt to manslaughter during the opening statement. Trial counsel maintained that Petitioner agreed to this strategy, which was discussed with him "about twenty-five times" in the year before his trial. Trial counsel believed that such a strategy was consistent with Petitioner's actions following the victim's death – namely, concealing her death, and his knowledge of it, and burying her body in a remote location – and that the strategy was agreed upon, in part, due to its success when previously utilized by counsel's law firm. Due to the prosecution's numerous witnesses and "great" circumstantial evidence, Petitioner's attorneys believed that this strategy was Petitioner's "best shot" at avoiding a first-degree murder conviction.

After the hearing, the trial court found that the testimony of Petitioner's attorneys was "much more credible than the [P]etitioner's testimony[.]" [Doc. 10-11 at 156]. The trial court categorized the trial strategy as "perhaps brilliant," noting that it "likely played a role in [Petitioner] avoiding a first-degree murder conviction." [*Id*.]. The trial court thus found no deficiency or prejudice, concluding that the strategy was a reasonable, tactical defense decision and that Petitioner could not

reflects the facts and testimony relevant to his claims. [Doc. 16 at 3; *see* Doc. 9 at 3-15]. Accordingly, the Court will summarize the relevant facts with respect to Petitioner's ineffective assistance of counsel claims as set forth by the TCCA and as agreed upon by both parties.

show any adverse effect from the use of the strategy nor any more favorable outcome if the strategy had not been used. [*Id.*]. Thus, it found no ineffective assistance of counsel and rejected Petitioner's claim. [*Id.*]. The trial court also rejected Petitioner's claim that trial counsel was ineffective for failing to request jury instructions on lesser-included offenses to voluntary manslaughter, reasoning that such a request would have been "suspect" in light of the reasonable trial strategy of admitting Petitioner's guilt to voluntary manslaughter. [*Id.* at 159-60].

On appeal, the TCCA affirmed the trial court's determination that counsel was not deficient for admitting Petitioner's guilt to voluntary manslaughter to the jury:

> Although the Petitioner did not sign a written waiver allowing trial counsel to argue before the jury that he was guilty of voluntary manslaughter, counsel's credited testimony was that the Petitioner consented to the trial strategy. Co-counsel stated that this strategy was discussed with the Petitioner "about twenty-five times" in the year before the trial. He said the Petitioner never stated that he did not want counsel to use this strategy. Trial counsel said his attempting to plead guilty to voluntary manslaughter and asking the jury for a manslaughter conviction during opening statements was part of their strategy. Counsel discussed the strategy with other attorneys in their firm long before the trial. Trial counsel stated that the strategy was discussed with the Petitioner and that the Petitioner agreed the strategy might be successful. Counsel advised the Petitioner of his constitutional right requiring the State to prove beyond a reasonable doubt each element of manslaughter. Counsel believed that this strategy was the Petitioner's "best shot" of avoiding a first-degree murder conviction and that manslaughter was consistent with the Petitioner's burying the victim's body in a remote location. We cannot conclude that the evidence preponderates against the trial court's conclusion that the strategy was reasonable given the facts of the case.

[Doc. 10-28 at 22]. Thus, the TCCA denied Petitioner's claim of ineffective assistance on this ground.

The TCCA, did, however find that counsel was deficient in failing to "request[] jury instructions on reckless and criminally negligent homicide because they were supported by the trial testimony and did not conflict with the Petitioner's theory of the case[.]" [*Id.* at 23-24]. Nonetheless, the court rejected Petitioner's claim of ineffective assistance, finding no prejudice, given that the jury

24

declined to convict Petitioner of the lesser offense of voluntary manslaughter, instead finding him guilty of second-degree murder.  [*Id*. at 24].

> a.      Admitting Petitioner's Guilt to Voluntary Manslaughter

Petitioner's first challenge is to the state court's findings of fact, as he argues that the state court erred in crediting counsel's testimony over that of Petitioner himself.  Petitioner, however, neglects to note that this Court is bound to accept the state court's findings of fact as true unless Petitioner presents "clear and convincing evidence" to the contrary.  28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue by a State court shall be presumed to be correct" unless the petitioner rebuts that presumption with clear and convincing evidence); *see Seymour v. Walker*, 224 F.3d 542, 551-52 (6th Cir. 2000).  Indeed, the United States Court of Appeals for the Sixth Circuit has expressly held that "in the context of a *Strickland* evidentiary hearing, it is for the [state court] judge to evaluate the credibility of the criminal defendant and the former defense counsel in deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption[.]"  *Shimel v. Warren*, 838 F.3d 685, 697 (6th Cir. 2016) (citing *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007)), *petition for cert. filed* (U.S. Feb. 22, 2017) (No. 16-1020).

Here, Petitioner points the Court to his testimony in state court, wherein he testified that he was unaware of counsel's strategy to admit Petitioner's guilt to voluntary manslaughter and that he did not agree with such a strategy.  However, that testimony was directly contrary to the testimony of trial counsel, who testified that the strategy was repeatedly discussed with Petitioner and that Petitioner agreed to utilize this strategy, as it represented his best shot of avoiding a conviction for first-degree murder.  The state court, after hearing all of the testimony and having had the opportunity to assess the credibility of the witnesses, credited the testimony of counsel over that of

25

Petitioner. Petitioner has submitted no evidence – let alone clear and convincing evidence – that would allow the Court to disregard the presumption of correctness afforded to the district court's credibility determination and accompanying findings of fact that Petitioner consented to the strategy of admitting guilt to voluntary manslaughter. Thus, the Court cannot find, based on the record before it, that the state court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2). The Court will thus accept the state court's finding that counsel's testimony was credible and will defer to the court's findings of fact in determining whether the state court's denial of this ineffective assistance of counsel claim was contrary to or an unreasonable application of the *Strickland* standard.

Petitioner's next argument is that counsel was deficient in failing to either obtain written consent or ensure that an on-the-record inquiry demonstrating consent was made prior to admitting Petitioner's guilt to voluntary manslaughter to the jury. As support for his argument, he primarily relies upon *Wiley v. Sowder*, 647 F.2d 642, 648-50 (6th Cir. 1981) ("*Wiley I*"), and correctly notes that, in that case, the Sixth Circuit found ineffective assistance based on counsel's admission of guilt to the jury without his client's consent. The Sixth Circuit further noted that "[i]n those rare cases where counsel advises his client that the latter's guilt should be admitted, the client's knowing consent to such trial strategy must appear outside the presence of the jury on the trial record…." *Id.*

This Court, however, finds *Wiley I* to be of limited, if any, utility in assessing the instant claim. First, the Sixth Circuit has narrowed the applicability of its holding in *Wiley I* in subsequent cases, clarifying that, while the on-the-record inquiry discussed therein represents "the preferred practice," such an inquiry is not required to satisfy due process. *See, e.g.*, *Ashley v. Koehler*, 840 F.2d 16, at *4 (6th Cir. 1988) (table); *Wiley v. Sowders*, 669 F.2d 386, 389 (6th Cir. 1982) ("*Wiley II*"). Additionally, *Wiley I* was decided before the Supreme Court decided *Strickland v. Washington*,

26

and thus ineffective assistance in that case was not found based on the two-prong deficient performance and resulting prejudice test that the state court was bound to use in deciding the instant dispute, an analysis to which this Court is similarly bound. And Petitioner has pointed to no case from the Supreme Court that has found deficient performance by counsel solely on the basis that counsel did not obtain an on-the-record consent or inquiry before utilizing a strategy of admitting Petitioner's guilt to a lesser-included offense.[8] The Court thus finds no basis upon which to find that counsel was deficient in failing to secure a written consent or on-the-record inquiry before admitting Petitioner's guilt to voluntary manslaughter.

Remaining is the Court's obligation to determine whether the state court's finding that counsel's performance was not deficient is contrary to, or an unreasonable application of, the *Strickland* standard. Crediting trial counsel's testimony, the state court noted that: (1) the decision to admit Petitioner's guilt to manslaughter was a strategic decision, made with the intention of avoiding a conviction for first-degree murder; (2) the strategy was consistent with Petitioner's version of events, to which he testified at trial, including his decision to bury the body in a remote location; (3) the strategy was discussed amongst the firm's lawyers long before trial; and (4) the strategy was discussed with Petitioner numerous times, and Petitioner agreed that it might be beneficial. It ultimately concluded that, under the *Strickland* standard, the strategy was reasonable given the facts of the case and that counsel was therefore not deficient.

The Court finds that the state court correctly set forth the governing legal standards for assessing this claim of *Strickland* error and further finds no error with the state court's application of

---

[8]    Indeed, even *Wiley I* did not involve a plea to a lesser-included offense during trial as a strategy to avoid conviction on a more severe charge. Instead, that case involved counsel's full and unequivocal admission of guilt as to all charges against his client, without any specific strategy for so doing, an action that the Sixth Circuit classified as "a surrender of the sword" and the functional equivalent of complete desertion of the client by the attorney. *Wiley I*, 647 F.2d at 649-51.

those legal standards. Indeed, numerous federal court decisions support the state court's conclusion that counsel's strategy of admitting Petitioner's guilt to a lesser-included offense was not unreasonable or constitutionally deficient. *See, e.g.*, *Goodwin v. Johnson*, 632 F.3d 301, 310 (6th Cir. 2011) (death penalty case, citing *Florida v. Nixon*, 543 U.S. 175 (2004), for the proposition that it is not deficient to concede guilt and focus on penalty phase); *Adams v. Brewer*, 2016 WL 1223350, at *10 (E.D. Mich. Mar. 29, 2016) (appeal pending) ("A defense counsel's concession that his client is guilty of a lesser-included offense is a legitimate trial strategy that does not amount to the abandonment of the defendant or a failure by counsel to subject the prosecutor's case to meaningful adversarial testing so as to amount to the denial of counsel. In this case, to the extent that trial counsel conceded that Petitioner was guilty of larceny from a person, it was part of a strategy to obtain an acquittal on the more serious carjacking charge.") (internal citations omitted); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1095-96 (E.D. Mich. 2004) ("A defense counsel's concession that his client is guilty of a lesser-included offense is a legitimate trial strategy that does not amount to the abandonment of the defendant or a failure by counsel to subject the prosecutor's case to meaningful adversarial testing so as to amount to the denial of counsel."); *see also Haynes v. Cain*, 298 F.3d 375, 381-82 (5th Cir. 2002); *Lingar v. Bowersox*, 176 F.3d 453, 459 (8th Cir. 1999); *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991). Thus, under the circumstances, the Court cannot conclude that the state court's decision on this claim was contrary to or an unreasonable application of the *Strickland* standard. Accordingly, the Court must **DISMISS** this claim for relief.

        b.        Failure to Request Jury Instructions on Other Lesser-Included Offenses

Petitioner's final argument with respect to counsel's strategy of admitting his guilt to voluntary manslaughter at trial is that this action deprived trial counsel of the opportunity to request, and the trial court of the opportunity to provide, jury instructions on any lesser-included offenses to

28

voluntary manslaughter, including criminally negligent homicide and reckless homicide. The state court agreed with Petitioner that counsel was deficient in failing to request jury instructions on additional lesser-included offenses, but nonetheless, denied his claim of ineffective assistance of counsel. Specifically, the state court found no prejudice from the error, given that the jury declined to convict Petitioner of the lesser offense of voluntary manslaughter, instead finding him guilty of second-degree murder.

The Court finds no error with the state court's conclusion that Petitioner failed to demonstrate prejudice as a result of counsel's failure to request jury instructions on additional lesser-included offenses. As the state court correctly noted, the jury convicted Petitioner of second-degree murder, specifically rejecting the opportunity to convict Petitioner of the lesser-included offense of voluntary manslaughter. Given that the jury found the evidence sufficient to justify a conviction for second-degree murder, the Court concludes that there is no reasonable probability that the jury would have convicted Petitioner of criminally negligent homicide or reckless homicide had counsel requested inclusion of instructions on those charges. *See State v. Williams*, 977 S.W.2d 101, 104-07 (Tenn. 1998) ("[B]y finding the defendant guilty of the highest offense [first-degree murder] to the exclusion of the immediately lesser offense, second-degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first-degree murder and its disinclination to consider the lesser-included offense of second-degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter."). This Court, like the state court, is convinced that counsel's alleged error had no effect on Petitioner's judgment. Thus, Petitioner has not demonstrated that the state court's denial of this ground of ineffective assistance was contrary to or an unreasonable application of

29

*Strickland*, and this claim will be **DISMISSED**.

         2.       Testimony of Dr. Charles Harlan

In Ground 5, Petitioner argues that trial counsel was ineffective in failing to adequately cross-examine, impeach, or elicit favorable testimony from the medical examiner, Dr. Charles Harlan.[9] [Doc. 1 at 13]. He argues that counsel's cross examination of Harlan was "less tha[n] sub-standard," that counsel failed to elicit favorable facts from Harlan regarding the duct tape that was used in the commission of the crime that could have called into question the cause of death, and that counsel failed to impeach Harlan's credibility with available information – specifically, Harlan's "past misconduct of intentionally lying about the cause of death" in other criminal cases. [*Id.*].

Dr. Harlan's trial testimony regarding the victim's cause of death, and trial counsel's cross-examination of the same, is set forth in detail in Section II(A)(2), *supra*. Additionally, it is undisputed that: (1) Dr. Harlan was being investigated for malpractice by the Tennessee Board of Medical Examiners at the time of Petitioner's trial; (2) his medical license was revoked approximately six months after Petitioner's trial; and (3) Harlan's autopsy of Petitioner's victim and testimony in Petitioner's trial were not called into question as a part of the Medical Board's investigation into Harlan and did not form any part of the basis for the revocation of his license. It is also undisputed that Petitioner's trial counsel did not raise the issue of the then-pending investigation into Harlan during the course of the trial.

Petitioner raised this ground of ineffective assistance of counsel in his post-conviction proceedings in state court. [*See* Doc. 10-10 at 36-47]. The trial court credited the testimony of counsel, namely, that counsel made a strategic decision not to question Harlan at trial about his then-

---

        [9]      Unlike his other grounds for relief, Petitioner did not expand upon this argument in his accompanying memorandum of law. [*See* Doc. 2].

pending medical board proceedings, as (1) no ruling had yet been made, and (2) counsel believed that he could adequately challenge Harlan's testimony regarding his medical findings and elicit favorable testimony from Harlan on cross-examination. [Doc. 10-11 at 156-57, 165-66]. It noted that Petitioner failed to present any evidence suggesting that his case was involved in Harlan's disciplinary proceedings before the Medical Board or that Harlan had been "negligent, incompetent, or deceitful" in performing the autopsy of Petitioner's victim or in testifying in Petitioner's case. [*Id*.]. The trial court further found that trial counsel "adequately challenged the doctor's opinion testimony via cross-examination, and the verdict of the jury supports the proposition that the jury did question the doctor's opinion." [*Id*. at 165]. It thus rejected Petitioner's claim of ineffective assistance of counsel with respect to counsel's questioning of Harlan.

On appeal, the TCCA affirmed the trial court's determination that counsel's examination of Dr. Harlan was not constitutionally infirm:

> Dr. Charles Harlan testified at the trial that the victim's cause of death was suffocation because he found no diseases or injuries consistent with blunt force trauma and because the victim's airway was blocked by duct tape. During co-counsel's cross-examination, Dr. Harlan testified that of the many thousands of autopsies he had performed, less than ten involved suffocation by duct tape. He said that although he concluded the cause of death was suffocation, he did not find any evidence supporting his conclusion other than the duct tape over the victim's mouth and nose. Dr. Harlan could not state with a reasonable degree of medical certainty that the victim was conscious before the duct tape was applied. He stated that a person could receive a "blow" that caused unconsciousness but did not "leave a mark." He agreed that someone who was unconscious might look dead.

> Dr. Harlan testified that petechial hemorrhaging was caused when the smallest blood vessels in the body ruptured and that it could be seen in the eyes as a result of suffocation. He said, though, that petechia was not required to diagnose suffocation. He said petechia supported such a conclusion but was not necessary. Dr. Harlan did not see petechia in the victim's eyes, face, lungs, or neck.

> The Petitioner argues that co-counsel should have questioned Dr. Harlan about the ten cases in which he performed autopsies involving duct tape and his conclusions that most of the victims were dead before the tape was applied. The Petitioner also argues

31

that co-counsel should have questioned Dr. Harlan about his failure to find evidence that the victim "thrash[ed] around" when Dr. Harlan told co-counsel before the trial that individuals who die as a result of suffocation "thrash around." We cannot conclude that co-counsel was deficient by failing to ask Dr. Harlan these questions. Co-counsel highlighted during cross examination that although Dr. Harlan concluded the victim suffocated, there was no evidence supporting his conclusion other than the duct tape. Dr. Harlan could not determine if the victim was conscious or unconscious when the duct tape was applied to the victim's hands, feet, and face. He agreed it was possible for a victim to receive a blow that caused unconsciousness but left no evidence of an internal or external wound. Dr. Harlan found no evidence of petechia but concluded suffocation did not always result in petechial hemorrhaging. Co-counsel presented evidence that it was possible the victim's cause of death was not suffocation as Dr. Harlan concluded and that she was rendered unconscious by a blunt force trauma, preventing the victim's struggling.

With regard to co-counsel's failure to impeach Dr. Harlan with the pending proceeding to revoke Dr. Harlan's medical license, we cannot conclude that co-counsel provided deficient performance. The Petitioner's trial was held in November 2004, and Dr. Harlan's medical license was permanently revoked in May 2005. Although co-counsel knew about the pending proceedings, he denied knowing the substance of the allegations and said he contacted Dr. Harlan's attorney before the trial to investigate the pending proceedings.

In any event, co-counsel elicited favorable testimony about whether the victim suffocated and whether the victim was conscious at the time the duct tape was applied. Cocounsel [sic] made the tactical decision not to question Dr. Harlan about the pending medical board proceeding because Dr. Harlan gave counsel exactly what counsel wanted. Because co-counsel made an informed tactical decision, we cannot conclude that co-counsel provided deficient performance.

[Doc. 10-28 at 20-21].

The record does not support Petitioner's contention that counsel's cross-examination of Harlan was "sub-standard." As the state court noted, counsel thoroughly cross-examined Harlan regarding his autopsy of the victim and his medical opinion regarding the victim's death. The Court agrees with the state court that the record demonstrates that counsel elicited favorable testimony from Harlan, as he called into question whether the victim suffocated as a result of the application of the duct tape and whether the victim could have been unconscious with the appearance of death at the time Petitioner applied duct tape to her face. Counsel testified that he was aware that Harlan was

32

facing investigation and prosecution by the medical board at the time of Petitioner's trial. However, a strategic decision was made not to question Harlan regarding his then-pending allegations of medical malpractice for two reasons: (1) no final adjudication had been rendered on those charges at the time of Petitioner's trial; and (2) counsel believed that he would be able to elicit favorable testimony from Harlan, and he did not want to impeach the credibility of a witness who provided beneficial testimony.

The Court agrees that counsel made a strategic decision regarding the scope of his cross-examination of Harlan after completing a thorough investigation and review of the law and facts of the case, and that decision was both reasonable and beneficial to Petitioner. The Court thus concludes that the state court's finding that counsel's actions with respect to Harlan were not deficient was not contrary to or an unreasonable application of *Strickland*, and this claim will be **DISMISSED**.

> 3. Ineffective Assistance of Counsel Claims Based on Petitioner's Sentence

In Ground 4, Petitioner argues that counsel was ineffective in failing to object to "erroneous and prejudicial" statements by the medical examiner that were contained in the pre-sentence report. [Doc. 2 at 23-27; Doc. 16 at 30-34]. Specifically, Petitioner notes that the presentence report contained a statement allegedly made by Harlan during the autopsy indicating that he had found duct tape particles in the victim's lungs. [Doc. 2 at 23-27]. Petitioner maintains that this statement is false, as it was not included in the autopsy report, Harlan's pretrial interviews, or his testimony at trial. [*Id.*]. Petitioner's counsel did not object to this statement, and the sentencing court relied upon it in applying an enhancement for exceptional cruelty to the victim, concluding that the statement indicated how desperately the victim tried to continue breathing. [*Id.*]. Petitioner argues that, absent this statement, there is a reasonable probability that his sentence would have been lower. [*Id.*].

33

Similarly, he argues that he was prejudiced by counsel's failure to include the trial transcript on appeal, as it deprived the appellate court of an opportunity to discover that the statement in the presentence report regarding duct tape in the victim's lungs was false and of the opportunity to review his sentence *de novo*. [*Id.* at 25-26; Doc. 16 at 30, 36]. He argues that, in light of the evidence presented at trial and the false statement in the presentence report, there is a reasonable probability that his sentence would have been reversed on appeal had counsel included the trial transcript. [Doc. 2 at 25-26].

The Court has determined that Petitioner's claim that his sentence was unlawful in light of *Blakely* must be granted, and it has accordingly ordered that Petitioner's sentence be vacated. Because the Court has granted his request for relief as to *Blakely* claim, thereby vacating Petitioner's sentence, his ineffective assistance of counsel claim based on his sentence is **MOOT** and will accordingly be **DISMISSED**. *See United States v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) (citing *United States v. Jones*, 489 F.3d 243, 255 (6th Cir. 2007)); *United States v. Jackson*, 244 F. App'x 727, 729 (6th Cir. 2007); *United States v. Milledge*, 109 F.3d 312, 316 n.2 (6th Cir. 1997)).

### 4. Ineffective Assistance of Appellate Counsel

In Ground 2, Petitioner asserts that appellate counsel rendered ineffective assistance. [Doc. 1 at 8-9, 11-12; Doc. 2 at 9-16; Doc. 16 at 18-23]. First, Petitioner contends that his appellate attorney rendered ineffective assistance in failing to adequately communicate or consult with him regarding the issues to be appealed. [Doc. 2 at 9-16; Doc. 16 at 20-22]. He argues that counsel knew or should have known that he wanted to appeal his underlying convictions, rather than just his sentence, based on his plea of not guilty, his past interest in appealing a conviction that reflected anything more than an accidental killing, and his very active involvement in his defense. [Doc. 16 at 22-23]. He argues that counsel should have asserted a claim challenging the sufficiency of the evidence on direct

34

appeal, based on the state's failure to meet its burden of proof and because the testimony and credibility of the medical examiner was been called into question after the verdict was rendered. [Doc. 2 at 9-16].

"Claims of ineffective assistance of appellate counsel are subject to the *Strickland* test, which requires a defendant to show both deficient representation and prejudice." *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009). When considering the *Strickland* standard in conjunction with the deferential standard of § 2254(d), the question in reviewing the state court's ruling "is whether there is any reasonable argument that [appellate] counsel satisfied *Strickland*'s deferential standard." *See Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Appellate counsel is not required "to raise every possible issue in order to render constitutionally effective assistance." *Hutton v. Mitchell*, 839 F.3d 486, 501 (6th Cir. 2016) (citing *Jones v. Barnes*, 463 U.S. 745, 750-53 (1983)); *see also Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) ("[T]he *Strickland* analysis does not require an attorney to raise every non-frivolous issue on appeal," nor does it require counsel to "raise an issue that lacks merit.") (internal quotation marks and citation omitted); *Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather, may select from among them in order to maximize the likelihood of success on appeal."). Instead, the presumption of effective assistance will generally only be overcome "when omitted arguments are clearly stronger than those presented." *Hutton*, 839 F.3d at 501 (citing *Smith*, 528 U.S. at 288); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004) ("Counsel's failure to raise an issue on appeal c[an] only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.").

35

When evaluating the issue of ineffective assistance of appellate counsel for prejudice, the Court must determine whether there is a reasonable probability that, but for his counsel's failings, the defendant would have prevailed on his appeal. *Evans*, 575 F.3d at 564. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 564-65 (citing *Burton v. Renico,* 391 F.3d 764, 773 (6th Cir. 2004); *Maples v. Stegall,* 340 F.3d 433, 437 (6th Cir. 2003)).

Petitioner raised this ground of ineffective assistance of counsel in his post-conviction proceedings in state court. [*See* Doc. 10-10 at 20-25]. The trial court noted that "the appeal taken on petitioner's behalf was successful," as his sentenced was lowered on direct review. [Doc. 10-11 at 152-53]. It also found that Petitioner "failed to show that there is a reasonable probability that an appeal as to his convictions would have been successful," as "[t]here was ample proof presented against the defendant[.]" [*Id*.]. Accordingly, the trial court rejected this claim of ineffective assistance. [*Id*.].

On appeal, the TCCA affirmed the trial court's determination that counsel was not deficient:

The record shows that counsel and the Petitioner discussed whether to appeal the Petitioner's convictions and that they agreed the best opportunity for appellate relief was to appeal the sentence. Although trial counsel testified that he feared the Petitioner would be tried again for first-degree murder if this court granted relief from the conviction, a wholly unfounded fear given double jeopardy protections, co-counsel denied this was a factor in determining whether to appeal the conviction. Co-counsel, who worked on the Petitioner's appeal, did not think there were any meritorious issues regarding the conviction. The Petitioner argues counsel should have raised sufficiency of the evidence …. We cannot conclude that the Petitioner was prejudiced.

With regard to the sufficiency of the evidence, we conclude that the evidence was sufficient to sustain the Petitioner's conviction for second-degree murder. *See* [Tenn. Code Ann.] § 39–13–210 (2010) (stating that second-degree murder is the knowing killing of another); *see also* [Tenn. Code Ann.] § 39–11–106(20) (2010) (stating that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result"). The

36

evidence showed that the Petitioner admitted striking the victim in the head, duct taping her hands and feet, duct taping her face from her nose to her chin, concealing her body, transporting her body to an island on Tim's Ford Lake, and burying the victim's body in a shallow grave. Various witnesses testified about the Defendant and the victim's pending divorce, inability to get along around the time of the victim's disappearance, and fighting over their two children.

The victim was last seen leaving work at 3:11 p.m. the day she disappeared. Greg Arp, the victim's coworker and boyfriend, and the victim discussed their evening plans during their lunch break. The victim called the Petitioner's home to speak with her children during lunch, but the Petitioner did not allow her to speak with them. Mr. Arp said that after work, the victim was supposed to pick up her children at the Petitioner's home, bring the children to Mr. Arp's home, and go to dinner together. Mr. Arp called the victim's cell and home phones around 3:30 or 4:00 p.m. because the victim had not arrived at his home with her children. He said that he was unable to reach her and that the victim did not return his calls.

Kara Matthews, the Petitioner's girlfriend at the time of the killing, said she arrived at the Petitioner's home around 4:30 or 5:00 p.m. the day the victim disappeared and that the Petitioner was pacing the kitchen floor, was sweating, and was nervous. The Petitioner told her a story about some of his friends suggesting that they steal the victim's truck. The Petitioner told her that he believed they were joking but that someone arrived at his home with the victim's keys thirty minutes before she arrived. The Petitioner said his friends left the truck in Kroger's parking lot. Ms. Matthews said the Petitioner requested that she drive him to the parking lot to find the victim's truck. She said that the truck was in the Advanced Auto Parts' parking lot, which was in the same strip mall as Kroger. She stated that the Petitioner got into the truck, that he told her he was going to take the truck back to his friend, and that she followed him. She said the Petitioner drove the truck to "Smokehouse and hotel" and wiped the steering wheel and the door with a cloth. He left the keys inside the truck. She said they went to buy fast food. She said the Petitioner acted "normal" after they left the truck. She stated that after they returned home, the Petitioner asked her to watch his children for a while.

The Petitioner told Mr. Rhoads that he killed the victim. According to Mr. Rhoads's testimony, the Petitioner said he had just put the children down for their naps when the victim appeared in the kitchen. The Petitioner stated that the victim was yelling at him and that before he knew what happened, he hit the victim, who fell to the floor. The cause of death, though, was suffocation. The medical examiner concluded the victim suffocated from the duct tape obstructing her airway. The autopsy did not show evidence of blunt force trauma to the victim's head, contradicting the Petitioner's version of events. We conclude the evidence was sufficient.

[Doc. 10-28 at 26-29].

In reviewing the sufficiency of the evidence, Tennessee courts assess "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In analyzing such a claim, the prosecution is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," with questions concerning credibility and the weight of the evidence resolved in favor of the decision reached by the trier of fact. *Id.*

Petitioner argues that counsel was ineffective in failing to raise a claim for sufficiency of the evidence on direct appeal because "the state failed to meet its burden of proof beyond a reasonable doubt." However, his arguments in support of this position are not arguments regarding the sufficiency of the evidence; rather, they are arguments regarding the *weight* of the evidence.[10] In reviewing whether Petitioner was prejudiced by counsel's failure to raise a claim of sufficiency of the evidence, the state court summarized the evidence in a manner that afforded the prosecution the

---

[10]    Petitioner states:

The Petitioner contends that this case is not one involving a traditional stabbing, shooting, or poisoning of the victim. This case is one involving a very heated and contentious divorce between the Petitioner and the victim. The victim's family members, some of whom were employed with the local law enforcement, had got involved in the divorce and made threats to the Petitioner, and had vandalized his home. The Petitioner and the victim were separated and living apart. The Petitioner had been living in duress. Yet, on the day of the victim's death she had driven to the Petitioner's home, sneaked into the home and attacked the Petitioner from behind. The Petitioner responded to the assault by striking a blow to the victims head using his bare hands. The blow rendered the victim unconscious, to the point of death. The Petitioner covered the victim's face in approximately nine (9) feet of duct tape. The medical examiner testified before the jury that the COD was asphyxiation. That testimony has since been called into serious question, and the Chief Medical Examiner, Dr. Charles Harlan, has since been prosecuted, disbarred by the medical board for intentionally lying about the COD in hundreds of cases, among many other fraudulent and unethical crimes including fraud and deceit. Indeed, the Petitioner's Pre-Sentence Report (PSR) stated that part of the Medical Examiner's autopsy report contained a finding that the victim had [particles] of [ d]uct [t]ape in her lungs. Thus supporting that she asphyxiated as she struggled so hard to breathe. This finding is, not only incredible and impossible, but also false. Thus, the state failed to meet it's [sic] burden of proof beyond a reasonable doubt.

[Doc. 2 at 10-11 (internal citations omitted)].

strongest legitimate view of the evidence and any reasonable inferences therefrom and gave deference to the jury's verdict in assessing the credibility of witnesses and weight of the evidence. Based on this view of the evidence, rather than Petitioner's own view which favors his testimony and version of events, the state court found that the evidence was sufficient to support Petitioner's conviction for second-degree murder and that he accordingly suffered no prejudice as a result of counsel's failure to raise this issue on direct appeal.

The Court cannot find that the state court unreasonably applied the *Strickland* standard in so holding. Although it is possible to draw inferences from the evidence presented at trial that would support Petitioner's theory of the case, the appellate court would have been constrained on direct review to view the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution and to the jury's verdict. Viewed in such light, the evidence presented at trial supports the Petitioner's conviction. Petitioner admittedly struck the victim in the head and applied duct tape to her face, covering her nose and mouth. He took numerous steps to conceal his actions, disposing of her personal items, wiping down her vehicle, leaving voicemails for the victim after he knew her to be dead, and transporting her body to a remote location for burial. The medical examiner testified that he assigned the cause of death to asphyxiation by duct tape, as the examination did not reveal any other possible cause of death; he testified that there was no evidence that the victim's cause of death was blunt force trauma.[11] Thus, under the standard of review for sufficiency of the evidence, a rational trier of fact could have concluded that the evidence supported a finding that Petitioner was

---

[11] Petitioner argues that the sufficiency of the evidence could have been challenged based on the fact that Harlan's medical license was suspended subsequent. Petitioner concedes, however, that no evidence or testimony regarding the investigation into Harlan was presented at trial and that his license had not been revoked at the time of trial. Petitioner's claims about Harlan's credibility were properly raised, considered, and rejected in his post-conviction proceedings in state court. Under these circumstances, and given that the evidence must be viewed in the light most favorable to the prosecution when undertaking a sufficiency of the evidence analysis, this argument is wholly without merit, and the Court cannot find that counsel was deficient in failing to raise these issues on direct review or that Petitioner was prejudiced by such failure.

39

guilty of second-degree murder – that is, that he knowingly killed his victim. There is, then, no reasonable probability that the outcome of Petitioner's appeal would have been more favorable had counsel raised this issue on direct review, and without such probability, Petitioner suffered no prejudice.[12] The Court accordingly cannot find that the state court unreasonably applied the *Strickland* standard in concluding that Petitioner was not prejudiced by counsel's failure to raise a sufficiency of the evidence claim on direct appeal, and this claim for relief will be **DISMISSED**.

## III.    CONCLUSION

For the above reasons, Grounds Two through Six of Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising claims of ineffective assistance of counsel, are hereby **DISMISSED**. However, the § 2254 petition will be conditionally **GRANTED** with respect to Ground 1, Petitioner's sentencing claim. Petitioner's sentence will accordingly be **VACATED**, and unless the State of Tennessee re-sentences him within ninety days, Petitioner **SHALL** be released from incarceration.[13]

## IV.    CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability as to those claims in Petitioner's § 2254 petition that the Court has now dismissed. Under the AEDPA, a habeas petitioner must obtain a certificate of appealability ("COA") to appeal a federal district court's final

---

[12]    The Court also notes that it does not find that counsel was deficient in failing to raise this claim for relief on direct review. Counsel raised only sentencing claims on direct review, finding no other meritorious claims for relief. Petitioner can show that this strategic decision was deficient only by demonstrating that omitted claims were stronger than those actually raised on direct review. *See Hutton*, 839 F.3d at 501. Given that the state court and this Court have concluded that a challenge to the sufficiency of the evidence on direct review had no likelihood to succeed on the merits, and that counsel actually did succeed in obtaining relief for Petitioner on two sentencing claims raised on direct review, Petitioner cannot make such a showing and has accordingly failed to demonstrate that counsel was constitutionally deficient.

[13]    If an appeal is taken and the Court's determination stands, the State of Tennessee must take such action within ninety days of the resolution of the appeal.

order in a habeas proceeding. 28 U.S.C. § 2253(c)(1). A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right," and, if issued, it "shall indicate which specific issue" satisfies that showing. 28 U.S.C. § 2253(c)(2)-(3). Where claims have been dismissed on their merits, a petitioner must show that reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001).

After having reviewed Grounds Two through Six of the petition, and in view of the law upon which the dismissal on the merits of the adjudicated claims is based, reasonable jurists could not disagree with the correctness of the Court's resolution of these claims. Because the Court's assessment of Petitioner's constitutional ineffective assistance of counsel claims could not be debatable by reasonable jurists, such claims are inadequate to deserve further encouragement, and the Court will **DENY** issuance of a COA. *See* 28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).


**IT IS SO ORDERED.**

**E N T E R :**


_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE